# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

## Appeal No. 24-12481
_____

## UNITED STATES OF AMERICA,

## Appellee,

## v.

## JOHNNY FLORES,

## Appellant.

_____

### APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA

_____

### INITIAL BRIEF

_____

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

MELISSA FUSSELL, ESQ.
Assistant Federal Defender
Florida Bar No. 0125967
201 S. Orange Ave., Ste. 300
Orlando, Florida 32801
Telephone: 407-648-6338
Melissa_Fussell@fd.org

## Appeal No. 24-12481

### *United States of America v. Johnny Flores*

#### CERTIFICATE OF INTERESTED PERSONS

The persons listed below are interested in the outcome of this case:

Bailey, Lynn P.

Corrigan, Honorable Timothy J.

Flores, Johnny

Flynn, Honorable Sean P.

Fussell, Melissa

Guzman, Maria

Hall, A. Fitzgerald

Handberg, Roger B.

Howard, Katherine G.

Irvin, Sylvia A.

Jung, Honorable William F.

Landes, Samuel

Padgett, Brooke Michelle

Rhodes, David P.

Sansone, Honorable Amanda A.

**Appeal No. 24-12481**

***United States of America v. Johnny Flores***

CERTIFICATE OF INTERESTED PERSONS – *CONT'D*

Sinacore, Michael C.

Stamm, Douglas Jordan

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Flores requests oral argument in this case. This appeal raises a question of first impression in this Circuit as to whether a patient has a reasonable expectation of privacy in substance use disorder treatment records that were confidentially held by a substance use disorder treatment clinic under the protection of the Drug Abuse Prevention, Treatment, and Rehabilitation Act, 42 U.S.C. § 290dd-2. Mr. Flores respectfully submits that argument by counsel familiar with the issues, facts, and record on appeal will help the Court in resolving this action.

## TABLE OF CONTENTS

Certificate of Interested Persons ............................................. C1

Statement Regarding Oral Argument ........................................ i

Table of Authorities................................................................. iv

Statement of Jurisdiction........................................................ vii

Statement of the Issues........................................................... 1

Statement of the Case ............................................................. 1

Course of Proceedings and Disposition in the Court Below .................... 1

Statement of the Facts ............................................................. 2

    A. The Instant Offenses ...................................................... 2

    B. Warrantless Search of Substance Use Disorder Treatment
       Records ....................................................................... 5

    C. Motions to Suppress........................................................ 8

    D. Trial.............................................................................. 11

    E. Sentence ...................................................................... 16

Standard of Review .................................................................. 16

Summary of the Arguments...................................................... 17

Argument and Citations of Authority........................................ 18

    I. Fourth Amendment "searches" include mere visual
    examination, even when law enforcement does not obtain
    physical possession of the thing they examine.............................. 18

II. Law enforcement's examination of Mr. Flores's substance use disorder treatment records violated the Fourth Amendment ................................................................... 21

    A. Mr. Flores had a reasonable expectation of privacy in his substance use disorder treatment records. ............... 21

    B. Law enforcement's searches of Mr. Flores's SUD treatment records were conducted without a warrant. .............................................................................. 25

    C. New Season did not voluntarily permit law enforcement to examine Mr. Flores's SUD treatment records ...................................................................... 27

III. Mr. Flores's substance use disorder treatment records are subject to the exclusionary rule ................................... 28

    A. A post-hoc order authorizing disclosure does not provide a basis for application of the good faith exception .......................................................................... 29

    B. The independent source doctrine is inapplicable where law enforcement conducted multiple searches without ever obtaining a search warrant ............................ 30

IV. The evidence derived from the searches of Mr. Flores's substance use disorder treatment records is fruit of the poisonous tree ................................................................. 32

Conclusion ........................................................................... 34

Certificate of Compliance ...................................................... 35

iii

## TABLE OF AUTHORITIES

**Cases**                                                                **Case(s)**

*Burdeau v. McDowell*, 256 U.S. 465, 475 (1921) ....................................27

*Carpenter v. United States*, 138 S. Ct. 2206 (2018) ..........................21, 26

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ..................................27

*Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000)..................22, 23, 25

*Ferguson v. City of Charleston*, 532 U.S. 67 (2001) ...............................21

*Illinois v. Krull*, 480 U.S. 340 (1987) ......................................................29

*Murray v. United States*, 487 U.S. 533 (1988).......................................33

*Nix v. Williams*, 467 U.S. 431 (1984).....................................................28

*State of Florida v. Flores*, Case No. 22-CF-002808-A...............................8

*State of Florida v. Flores*, Hillsborough County,

    Case No. 22-CF-002808-A ..................................................................23

*United States v. Bryant*, 2018 WL 6271591 (S.D. Ohio Nov. 30, 2018),

    *aff'd*, 849 F. App'x 565 (6th Cir. 2021) ..............................................23

*United States v. Caraballo*, 595 F.3d 1214 (11th Cir. 2010) ..................16

*United States v. Cresta*, 825 F.2d 538 (1st Cir. 1987) ............................23

*United States v. Gayden*, 977 F.3d 1146 (11th Cir. 2020)......................26

*United States v. Jacobsen*, 466 U.S. 109 (1984)...............................18, 27

iv

| Cases | Case(s) |
|---|---|

*United States v. Magluta*, 418 F.3d 1166 (11th Cir. 2005)....................25

*United States v. Morales*, 987 F.3d 966 (11th Cir. 2021) .......................28

*United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012)......30, 31

*United States v. Perez*, 661 F.3d 568 (11th Cir. 2011)............................16

*United States v. Ross*, 963 F.3d 1056 (11th Cir. 2020) ...........................29

*United States v. Westinghouse Elec. Corp.*,

    638 F.2d 570 (3d Cir. 1980) ................................................................22

| Statutes | Case(s) |
|---|---|

18 U.S.C. § 924(c)(1)(A)(ii) .........................................................................1

18 U.S.C. § 1951 ...........................................................................................1

18 U.S.C. § 3231 .........................................................................................vii

18 U.S.C. § 3742 .........................................................................................vii

28 U.S.C. § 1291 .........................................................................................vii

28 U.S.C. § 1294 .........................................................................................vii

42 CFR Part 2.............................................................................................23

42 C.F.R. § 2.11 .........................................................................................24

42 C.F.R. § 2.65 ................................................... 8, 10, 19, 26, 29, 31, 32

**Statutes**                                            **Case(s)**

42 U.S.C. § 290dd-2(a) ............................................................. 8, 22, 24, 29

U.S. Const. amend IV ............................. 1, 9, 17, 18, 19, 20, 21, 25, 26, 27

## STATEMENT OF JURISDICTION

This is a direct appeal of a criminal case before the United States District Court for the Middle District of Florida, Tampa Division, Case No. 8:22-cr-00279-WFJ-SPF-1. The district court had original jurisdiction under 18 U.S.C. § 3231. The district court entered judgment on July 22, 2024. Doc. 174. Mr. Flores filed a timely notice of appeal. Doc. 176. Jurisdiction now lies with this Court. 18 U.S.C. § 3742; 28 U.S.C. §§ 1291, 1294.

## STATEMENT OF THE ISSUES

I.    Whether law enforcement's visual examination of something can constitute a search under the Fourth Amendment, even when law enforcement does not retain physical possession of the same;

II.   Whether law enforcement's visual examination of substance use disorder treatment records was a search under the Fourth Amendment;

III.  Whether the exclusionary rule applies to substance use disorder treatment records that were searched without a warrant;

IV.   Whether the evidence derived from the warrantless searches of Mr. Flores's substance use disorder treatment records should be suppressed as fruit of the poisonous tree.

## STATEMENT OF THE CASE

### Course of Proceedings and Disposition in the Court Below

On August 9, 2022, Mr. Flores was charged by indictment with three counts of interference to commit robbery, in violation of 18 U.S.C. § 1951(a) and (b), and three counts of using, carrying, or brandishing a firearm during and in relation to a crime of violence (robbery), in violation of 18 U.S.C. § 924(c)(1)(A)(ii). Doc. 1. A jury convicted Mr. Flores of the

1

three robbery counts. Doc. 152. The remaining three counts, on which
the jury did not reach a verdict, were later dismissed on the government's
motion. Doc. 188. The district court imposed 540 months' imprisonment,
and Mr. Flores is currently incarcerated under this sentence. Doc. 174.
Mr. Flores filed a timely notice of appeal. Doc. 176.

## Statement of the Facts

### A. The Instant Offenses

According to Tampa Police Department ("TPD") records, a
Marathon convenience store was robbed on February 13, 2022 at
approximately 9:14 AM. Doc. 49-1. The suspect was described as a 5 feet
8 inch tall Hispanic and/or black male wearing a blue Tommy Hilfiger
windbreaker, jeans, tan boots, a black face mask, a baseball cap with a
green bill, and a green hoodie. *Id.*

TPD records also aver that a Sunoco convenience store in Tampa
was robbed on February 23, 2022 at approximately 9:40 AM. Doc. 49-2.
A Sunoco employee purportedly described the suspect as a black male, no
more than thirty years old,[1] approximately 5 feet 5 inches tall and 160

---

[1] Mr. Flores is forty-six years old, and he is not a black male. Doc.
164 at 3 (describing Mr. Flores as a white male).

pounds, wearing a red Nike hoodie, a black "covid" mask, and a baseball cap. Doc. 49-3. A report authored by Officer Johnson described surveillance footage from a nearby residence showing the suspect running and getting into the passenger seat of a silver Jeep Cherokee SUV. Doc. 49-4.

TPD records indicate that the DK Supermarket in Tampa was robbed on February 25, 2022 at approximately 10:00 AM. Doc. 49-5. A DK supermarket employee purportedly described the suspect as a short white male (approximately 5 feet, 3 inches in height and 145 pounds) in a white jacket wearing a full-face mask. Doc. 49-6. A report authored by Officer Diebel reviewed surveillance footage and concluded that the suspect left the store on foot and then got into the passenger seat of a silver Jeep Cherokee bearing the license plate number "Y077HW." Doc. 49-7.

According to Detective Libertz's report, by February 25, 2022, a DHSMV search had revealed that Michael Field (who was not the registered owner) had recently driven the vehicle. Doc. 49-8. Detective Libertz sought a search warrant to install a tracking device on the Jeep. At some point on or before Feb 28, Officer Hutton placed the tracking

device on the Jeep after locating it "within the area of the registered owner's address." Doc. 49-9. On March 2, 2022, Detective Sackrider received a response to a law enforcement request from Uber, which indicated that Michael Field had an Uber account associated with the Jeep. Doc. 49-10. The day after Detective Sackrider received that response, on March 3, 2022, the state attorney subpoenaed Uber for account records related to the Jeep and a search warrant was issued for Uber records on Michael Field and the Jeep. Doc. 49-10.

TPD officers interviewed Michael Field on March 7, 2022. Doc. 49-11. Officer Camp's report described the interview as follows:

> Field told detectives that he was hired as an Uber driver by a person he knows as "JB." Field recalled driving JB to the area near the Sunoco gas station and the DK Supermarket on the dates of the robberies. Field claimed he did not know that JB committed robberies at those locations. Field knows JB from meeting him at a Methadone treatment clinic in Tampa, FL. Field advised that he drove JB to a residence located at 10220 Oklawaha Avenue, Tampa, FL. Detectives identified Johnny Flores, HIM, date of birth 09/19/1978, as residing at that address. Flores matched the description of the robbery suspect. Field positively identified Flores as "JB" and as the person he drove to locations near the robberies. Detectives showed Field surveillance videos from the Sunoco and DK Supermarket robberies. Field admitted that it was him (Field) that was driving the silver Jeep Cherokee and that Flores was the person who was with him.

*Id.*

4

The audio recording of the Field Interview makes clear that Field was not as confident as the report suggests. At approximately ten minutes and fifty seconds into the audio recording of the interview, Field was asked if he would be able to identify "JB" if he had changed his appearance, and Field responded, "He's pretty noticeable, I mean yeah." Next, Field is shown a still photo of the suspect from the Sunoco robbery and asked if it is "JB." Field responds, "Uhhhh, maybe? He looks a little skinny, uh, he looks a little more clean cut, I mean, ugh, that's tough. Tough. Every time I see him at the clinic, he usually has a red hoodie on, so, I mean. I would probably say yeah, I'm not 100%, but like eighty?" At approximately fourteen minutes in, Field says that he had usually only seen him wearing a red hoodie. The next day, Mr. Flores was charged in state court with one count of robbery with a firearm based on the February 25 incident. Doc. 49-12.

## B. Warrantless Search of Substance Use Disorder Treatment Records

On March 15, 2022, Officer Burgos went to New Season Treatment Center, where he inquired about video footage. Doc. 78 at 117. A supervisor on duty informed him that they would not voluntarily provide the video footage, and that a subpoena would be required. *Id.* Later that

day, the state of Florida issued a subpoena for "Video surveillance footage from 02/18/2022 - 02/26/2022 from all cameras systems at the New Season (formerly Tampa Metro Clinic) Treatment Center. Footage should be during treatment and methadone distribution hours 05:30am - 01:30pm. **Also all information about patient** (name redacted) (date of birth redacted)." Doc. 49-13 (emphasis added). The following day, Officer Burgos went to New Season Treatment Center, where the director—to whom the subpoena was directed—gave him access to Mr. Flores's substance use disorder ("SUD") treatment records,[2] including the exact time Mr. Flores underwent medical treatment on February 25. Officer Burgos then used them to identify and review videos of Mr. Flores seeking and obtaining SUD treatment. Doc. 49-14.

Officer Burgos was able to create a still image of Mr. Flores from one of the videos, which he juxtaposed with an image from the February 25 convenience store surveillance footage in an effort to show that Mr. Flores was the robbery suspect. *Id.*

---

[2] This review of Mr. Flores's SUD treatment records, Mr. Flores argues, was the original "poisonous tree"—the first illegal search that tainted the evidence derived from it.

On March 31, 2022, the state of Florida issued another subpoena, this time compelling the New Season director to produce a "Copy of any and all surveillance footage for the date of 02/13/2022 providing footage of (name redacted) (date of birth redacted)" and to "Provide any documentation/proof of (redacted) arrival/departure at this location on 2/13/2022." Doc. 49-15. On April 4, 2022, Officer Brown went to New Season to view the records that had been compelled by the March 31 subpoena. Doc. 49-16. While the director allowed him to view the subpoenaed records, she refused to provide him with physical copies of them, citing patient confidentiality. *Id.* Officer Brown's report noted that the government was in the process of trying to obtain the records via grand jury subpoena, but it failed to mention the state subpoenas that had already been issued. New Season moved to quash the state subpoenas, though the state court never ruled on the motions. The grand jury subpoena was not issued until April 15, 2022. Doc. 70-1 at 3. New Season unsuccessfully moved to quash that subpoena in May of 2022. Doc. 70-1 at 1.

The government successfully sought an order authorizing disclosure under 42 C.F.R. § 2.65,[3] but it did not seek a search warrant for the records. Doc. 70 (order was later modified because it did not meet requirements). In the words of the attorney for New Season, that "order, together with the subpoena, allowed us to produce in accordance with the regulation." Doc. 78 at 99. That is, the order permitted them to comply with the subpoena ordering production of the medical records without independently violating the law. *See id.* at 102. Without the order, it would have been unlawful for New Seasons to comply with the subpoena. *See id.* at 103-104. On August 9, 2022, Mr. Flores was indicted on federal charges for the three robberies. Doc. 1. The state charges were nolle prossed later that same month. State's Notice of Nolle Prosequi (Filed Aug. 26, 2022), *State of Florida v. Flores*, Case No. 22-CF-002808-A.

## C. Motions to Suppress

Mr. Flores filed a motion to suppress the fruits of the warrantless search of his private SUD treatment records and requested an evidentiary hearing on the matter. Doc. 49. Contemporaneously, Mr.

---

[3] 42 C.F.R. § 2.65 is a regulation implementing the confidentiality provisions of the Drug Abuse Prevention, Treatment, and Rehabilitation Act ("DAPTRA").

Flores moved to compel the government to produce the documents New Season had attached to its motion to quash the subpoena, including communications between New Season and the government and a copy of the subpoena itself. Doc. 51. An evidentiary hearing was held on the motions. Doc. 66. The court granted the motion to compel. Doc. 78 at 15-18.

Ultimately, the magistrate judge entered a Report and Recommendation ("R&R") on the motion to suppress, recommending that it be denied. Doc. 86. The R&R reasoned that law enforcement's visual examination of the written treatment records did not implicate the Fourth Amendment because law enforcement viewed them without physically "obtain[ing]" them. Doc. 86 at 14. Having disregarded that critical point, the R&R concluded that Mr. Flores had no reasonable expectation of privacy in the video records of him seeking and receiving SUD treatment. *Id.* at 15. Finally, the R&R *sua sponte* applied the good faith and independent source doctrines to hold that, even if there were a reasonable expectation of privacy in the video records, the exclusionary rule would not apply. *Id.* at 15-20. Over Mr. Flores's objections, and after correcting one factual error, the district court adopted the rest of the R&R

and denied the motion to suppress in an endorsed order, stating, "Although no comfort to the defense, the Court notes that the motion was crafted and presented at the very highest level of lawyering excellence." Doc. 114; Doc. 113.

The following month, the government filed an application for an additional order under 42 C.F.R. § 2.65 seeking authorization for the disclosure of information from New Season. Doc. 118. Previously, New Season had refused to provide the government with patient sign-in sheets and the names and information of employees who could authenticate the videos at issue. *Id*. at 1-2. The § 2.65 application included a written proffer of "evidence," but it was not made under oath or penalty of perjury. Mr. Flores opposed the application, arguing that it was the fruit of a prior unlawful search, and that, if granted, the application would result in a new unlawful search. Doc. 119 at 1. The district court granted the application in an endorsed order, Doc. 120, but later entered an amended order finding that the government had shown good cause for the disclosure of the employee information and "good and probable cause that these video surveillance recordings allegedly depict defendant's

10

activities on the premises of New Season." Doc. 123 at 2. The district court's probable cause "finding" was not based on sworn evidence.

After the government obtained the additional SUD treatment records, Mr. Flores filed a second motion to suppress, arguing again for the suppression of the written records of his treatment and the fruits of those records. Doc. 126. The district court denied the second motion to suppress in an endorsed order. Doc. 143.

## D. Trial

On the first day of trial, defense counsel noted on the record that, due to the denial of the motions to suppress, Mr. Flores's defense approach had dramatically changed. Doc. 169 at 6-7. After the jury was empaneled and opening statements concluded, the government called various witness. The Marathon shopkeeper testified, as well as the detective and officers who investigated the robbery of the Marathon store. *Id.* at 140-61. Officer Piekarz testified that the shopkeeper said he may have known who was involved in the robbery, but he did not identify him. *Id.* at 151-52. Officer Lindemann testified that he reviewed the surveillance videos, took still photos of the suspect, and created a bulletin for the law enforcement database. *Id.* at 154.

11

After that, the government called Abdul Zaahir Qawi, who testified that he was an Uber driver and had given Mr. Flores rides from the clinic, and that on February 13, 2022, he had dropped Mr. Flores off near a Shell gas station and a meat store. *Id.* at 163-64. Mr. Qawi testified that, after dropping off Mr. Flores, he went to back to the clinic area and stopped at the nearby Marathon gas station. *Id.* at 164. Mr. Qwai identified the man on the Marathon surveillance videos, who was wearing a green hoodie, as Mr. Flores. *Id.* at 166. Mr. Qwai further testified that he had left the store by the time of the robbery. *Id.* at 168.

Next, the government called Agent Camp, who had investigated the robberies at the Sunoco and DK, and, later, Marathon stores. *Id.*at 170-72. Agent Camp testified that he interviewed Mr. Qwai and told him he was investigating a robbery of the Marathon gas station on February 13, 2022 and asked about the blue Camry in the surveillance video. *Id.* at 176. Agent Camp said Mr. Qwai mentioned a person by the name of "J.B.," and that Mr. Qwai picked a photo of Mr. Flores out of a photo lineup, although he declined to identify him on paper or sign the photo lineup. Doc. 169 at 176-79.

12

Agent Camp stated that Mr. Qawi said he met "J.B" at a clinic, that Tampa Police had gotten video footage from the clinic, and that Agent Camp had followed up with the clinic to get additional video footage. *Id.* at 180-81. Agent Camp testified that the video footage showed areas within the clinic, and that the video showed a patient's clothing detail "right down to reading Hilfiger on the back of a jacket." *Id.* at 181. Defense counsel objected based on the pretrial litigation motion; the court overruled the objection. *Id.* at 181-82. Agent Camp indicated that the clothing worn by Mr. Flores in the clinic videos was identical to the clothing worn by the suspect in the DK and Marathon robberies. *Id.* at 182.

With regard to the Sunoco robbery, Agent Camp testified that there was no footage of Mr. Flores at the clinic. *Id.* at 183. Rather, Agent Camp averred, he obtained video of an unrelated police interaction with Mr. Flores at his residence that showed the red Nike hoodie from the Sunoco robbery. *Id.* at 183-84. Defense counsel objected to that testimony, and the court overruled the objection. *Id.* at 183. The government called Officer Drumsta, who had met with Mr. Flores at his residence, after

13

that, but he did not recall what Mr. Flores had been wearing. *Id.* at 189-90.

The government then called Mr. Miah, the shopkeeper from the DK store, who testified about his experience during the robbery. Doc. 170 at 4. After that, the government called Officer Burgos, who had investigated the DK store robbery. *Id.* at 11,14. Officer Burgos testified that he learned Mr. Flores was at a nearby clinic just prior to the robbery, so he went to the clinic and tried to obtain surveillance footage from that day. *Id.* at 15-16. Defense counsel objected to Officer Burgos's testimony that he viewed the video footage at the clinic and concluded that the patient in the video was the same person he saw in the DK store surveillance video. *Id.* at 16. Officers Koppe and Diebel, who had also been involved with the DK store investigation, testified next. *Id.* at 18, 23.

The government then called Wanda Laine, director of the New Seasons clinic. *Id.* at 28. She testified that an officer came to the clinic and tried to obtain video footage, but that she refused because the officer did not have "paperwork." *Id.* at 29. She said she then received some kind of legal document—she could not recall whether it was a court order or a

14

warrant—and that the New Seasons legal department then turned over the video. *Id.* at 29.

The government then called Officer Libertz, who testified about her involvement in the Sunoco robbery investigation. *Id.* at 35. Agent Campos was recalled, and he testified further about the videos from the New Season, pointing out Mr. Flores inside the clinic and the clothes he was wearing and comparing them to the surveillance videos from the stores. *Id.* at 46-56. Finally, the Sunoco shopkeeper testified about his experience during the robbery. *Id.* at 64-74. After that, the United States rested its case. *Id.* at 75.

The defense called investigator Raven Hicks, who testified about pellet guns. Doc. 170 at 76-80. After that, the defense rested. Doc. 170 at 80. The defense then moved for a judgment of acquittal. Doc. 170 at 81. The court denied the motion, and the attorneys gave their closing arguments. After deliberation, the jury was deadlocked on the three firearm counts, and they returned a verdict of guilty on the three robbery counts. Doc. 171 at 2-3.

**E. Sentence**

At sentencing, the district court determined that Mr. Flores had a total offense level of 31 and a criminal history category of IV. Doc. 211 at 11. The district court concluded that the advisory range was 151 months to 188 months' imprisonment, with a one to three-year term of supervised release. *Id.* at 11. The government sought the statutory maximum: twenty years' imprisonment on each count, to be served concurrently. *Id.* at 12. The district court varied upward, sentencing Mr. Flores to consecutive 180-month sentences on each count, a total of 45 years' imprisonment—more than double the time the government sought due to the consecutive nature of the sentences. *Id.* at 29.

## STANDARD OF REVIEW

This Court reviews a district court's denial of a defendant's motion to suppress evidence as a mixed question of law and fact. *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011). This Court reviews the court's findings of fact for clear error, but it reviews de novo the court's application of the law to those facts. *United States v. Caraballo*, 595 F.3d 1214, 1222 (11th Cir. 2010).

16

## SUMMARY OF THE ARGUMENTS

The lower court erred in denying Mr. Flores's suppression motions. As an initial matter, the lower court erroneously reasoned that visual examination of SUD treatment records could not amount to a search because law enforcement had not obtained physical custody of the records. That false premise polluted the lower court's entire analysis and demands reversal on its own.

Law enforcement entered a private SUD clinic and, backed up by compulsory process, demanded to see Mr. Flores's SUD treatment records. Mr. Flores had a reasonable expectation of privacy in those treatment records, and the warrantless search of them violated the Fourth Amendment. New Season did not provide law enforcement with records of its own volition; it only showed the records after police showed up with a subpoena compelling them to do so. Because they were the subject of a warrantless search, Mr. Flores's SUD treatment records are subject to the exclusionary rule. When conducting the search, law enforcement did not rely in good faith on any statute that authorized such a warrantless search, nor did law enforcement have an independent source for the information gained from the records. Because law

enforcement's initial search of Mr. Flores's SUD treatment records was unlawful, the evidence derived from it should be excluded as fruit of the poisonous tree.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.    Fourth Amendment "searches" include mere visual examination, even when law enforcement does not obtain physical possession of the thing they examine.

The lower court's mistaken belief that visual examination cannot itself be a Fourth Amendment search fatally undermined its entire analysis. The first clause of the Fourth Amendment "protects two types of expectations, one involving 'searches,' the other 'seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." *Id*. In contrast, "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property. *Id*. Axiomatically, the Fourth Amendment protects against warrantless searches even when no seizure occurs. But here, the lower court erroneously reasoned that visual examination could not amount to a search under the Fourth Amendment unless or until law enforcement obtained lasting physical possession of the subject of the

search. *See* Doc. 86 at 14. This faulty premise undermined the lower court's Fourth Amendment analysis.

With respect to the written SUD records, the lower court's false premise prevented it from ever reaching the question of whether Mr. Flores had a reasonable expectation of privacy in them. The lower court expressly declined to address the question of whether Mr. Flores had a reasonable expectation of privacy in his written SUD treatment records, stating, "[T]his Court need not decide the issue today because the Government did not *obtain* treatment records from New Seasons in response to the grand jury subpoena and/or the Court's Amended Order— it only obtained security videos from the clinic." Doc. 86 at 14 (emphasis added).

Due to this pernicious misunderstanding of the Fourth Amendment's reach, the lower court also failed to address the visual examination of the video SUD treatment records that occurred prior to law enforcement obtaining physical possession of those records following the § 2.65 order. Instead of considering whether the initial examinations of the written and video records were constitutional, the lower court

19

considered only the constitutionality of the examinations that occurred *after* law enforcement obtained physical possession of the videos.

Concluding that a warrantless examination of medical records is not a search simply because law enforcement did not physically take the records back to the station with them is a grave error that cannot be allowed to stand. Obviously, the Fourth Amendment's protections are not limited to seizures where the government takes physical custody of an item. Warrantlessly searching papers in which there is a reasonable expectation of privacy violates the Fourth Amendment even when the government does not "obtain" those papers, just as a warrantless search of a home is unconstitutional even though the government does not "obtain" the home. Under the lower court's logic, police could search anything they wanted to without a warrant, so long as they did not take it with them after they finished searching it. Such reasoning is fundamentally incompatible with the Fourth Amendment. The lower court's decision to adopt it was an egregious error that must be reversed.

## II.  Law enforcement's examination of Mr. Flores's substance use disorder treatment records violated the Fourth Amendment.

Armed with a subpoena demanding "all information about patient [Johnny Flores]," law enforcement went into the private records room of a SUD treatment clinic and examined Mr. Flores's written medical records and then, based on that review, examined video records that showed Mr. Flores seeking and obtaining treatment for his substance use disorder. That warrantless search of Mr. Flores's SUD treatment records violated the Fourth Amendment.

### A. Mr. Flores had a reasonable expectation of privacy in his substance use disorder treatment records.

"When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' [the Supreme Court has] held that official intrusion into that private sphere generally qualifies as a search." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018). The Supreme Court has recognized that patients have a "reasonable expectation of privacy" in their medical records. *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001) ("The reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests

21

will not be shared with nonmedical personnel without her consent."). "There can be no question that an [individual]'s medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980). "The reason for this is apparent: medical treatment records contain intimate and private details that people do not wish to have disclosed, expect will remain private, and, as a result, believe are entitled to some measure of protection from unfettered access by government officials." *Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000).

With medical records of SUD treatment, like those at issue here, this reasonable expectation of privacy is heightened by statutory and regulatory confidentiality protection under DAPTRA. Federal law requires confidential treatment of and limits disclosures of "[r]ecords of the identity … or treatment of any patient which are maintained in connection with the performance of any program or activity relating to substance use disorder … treatment." 42 U.S.C. § 290dd-2(a). The statute "and the governing regulations carry a strong presumption against

22

disclosing records of this kind." *United States v. Cresta*, 825 F.2d 538, 551–52 (1st Cir. 1987).

As New Season stated in its Amended Motion to Quash, "violation of 42 CFR Part 2 by *anyone* is a federal crime." Non-Party's Amended Motion to Quash or Modify the Subpoenas and for Protective Order (filed April 28, 2022) at 5, *State of Florida v. Flores*, Hillsborough County, Case No. 22-CF-002808-A. The regulations "further 'shield the patient who is receiving treatment,' and '[i]n addition to the titles of the statute and regulation, Congressional intent that the patients are the focus is made further evident in the redaction procedures outlined, and in the prohibition on prosecuting patients whose treatment information is released by court order.'" *United States v. Bryant*, No. 17-CR-146, 2018 WL 6271591, at *3 (S.D. Ohio Nov. 30, 2018), *aff'd*, 849 F. App'x 565 (6th Cir. 2021).

As a patient of New Season who was seeking and obtaining SUD treatment, "[t]here is no question that [Mr. Flores] maintained a genuine subjective expectation of privacy in his records and files kept at the methadone clinic." *Broderick*, 225 F.3d at 450. The written treatment records revealed the precise date and time of his treatment, as well as

23

the specific type of treatment he received. Mr. Flores's expectation that the government would not be reviewing his written SUD treatment records was a reasonable one.

With respect to the video SUD records, law enforcement only identified the videos through its review of the written records. Because the videos are poisonous fruit, that alone is grounds for suppression. *See* Part IV, *infra.* But even considering the video records independently, the videos were part of Mr. Flores's SUD treatment records, as explained by New Season in its filings. *See* Doc. 72-4 at 9-10. The videos of Mr. Flores seeking and obtaining SUD treatment fall under the protection of DAPTRA, which limits disclosure of "any information identifying a patient as being or having been diagnosed with a substance use disorder, having or having had a substance use disorder, or being or having been referred for treatment of a substance use disorder either directly, by reference to publicly available information, or through verification of such identification by another person." 42 C.F.R. § 2.11. As the Fourth Circuit has held, DAPTRA "is a fitting indication that society is willing

to recognize [the subjective] expectation of privacy as objectively reasonable." *Broderick*, 225 F.3d at 450.[4]

When Mr. Flores sought and obtained treatment at New Season, with its frosted windows, its controlled access to the treatment area, and its dispensing-window privacy barriers, he reasonably expected that the government would not be reading his SUD treatment records, much less *watching* from an indoor, aerial vantage point. Law enforcement's visual examinations of Mr. Flores's SUD treatment records were searches within the meaning of the Fourth Amendment.

### B. Law enforcement's searches of Mr. Flores's SUD treatment records were conducted without a warrant.

To legally conduct a search, the Government must obtain a warrant or rely on some exception to the warrant requirement. *United States v. Magluta*, 418 F.3d 1166, 1182 (11th Cir. 2005). Here, the government did neither. Law enforcement conducted the searches of the written and

---

[4] The lower court's ruling appeared to turn on its characterization of the video footage as "security videos." Doc. 86 at 14. But regardless of what sort of cameras the videos were captured on, the videos here showed Mr. Flores seeking and obtaining SUD treatment, and they were part of Mr. Flores's SUD treatment records, as explained above.

video records armed with a subpoena for all patient information about Mr. Flores; they never obtained a search warrant.[5]

Of course, a subpoena is not a substitute for a warrant supported by probable cause.[6] The Supreme Court "has never held that the Government may subpoena third parties for records in which the suspect has a reasonable expectation of privacy." *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018). "If the choice to proceed by subpoena provided a categorical limitation on Fourth Amendment protection, no type of record would ever be protected by the warrant requirement." *Id.* at 2222. "Before compelling" a third party to produce such records, "the Government's obligation is a familiar one—get a warrant." *Id.* at 2221.

---

[5] Notably, although the lower court declined to address the issue, it did not dispute that police require a warrant to examine the written SUD treatment records. Doc. 86 at 13-14 (citing *Doe*, 225 F.3d at 451; *United States v. Gayden*, 977 F.3d 1146, 1152 (11th Cir. 2020)).

[6] A § 2.65 order is no substitute for a warrant, either. But even if it were, although the government later obtained § 2.65 orders, they had not done so at the time of the searches of Mr. Flores's written and video records at New Season. Indeed, the applications for both § 2.65 orders relied on the information gained from law enforcement's prior searches of the records. *See* Doc. 97 at 20-21; Doc. 118.

### C. New Season did not voluntarily permit law enforcement to examine Mr. Flores's SUD treatment records.

The Fourth Amendment does not protect against private actors. *See Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). Accordingly, the Supreme Court has held that, where a private person has provided contraband "of her own accord," "it was not incumbent on the police to stop her or avert their eyes." *Coolidge v. New Hampshire*, 403 U.S. 443, 489 (1971). In *Jacobsen*, the Supreme Court concluded that, where the private party, *of its own accord*, invited law enforcement to examine a package, " [t]he agent's viewing of what a private party had freely made available for his inspection did not violate the Fourth Amendment." *United States v. Jacobsen*, 466 U.S. 109, 119 (1984).

The lower court appeared to conclude that New Season freely made Mr. Flores's SUD treatment records available for law enforcement review *See* Doc. 86 at 19. That conclusion is belied by the record. The evidentiary transcript clearly shows that they were only allowed to view the records upon serving New Seasons with compulsory process—subpoenas. *See, e.g.*, Doc. 78 at 106. Thus, New Season did not freely make the records available for examination of its own accord. Tellingly, when law enforcement showed up without a subpoena, New Season refused to allow

examination of the SUD treatment records. That is why law enforcement decided to obtain the subpoenas. Thus, to the extent that the lower court found that New Season freely permitted law enforcement to review Mr. Flores's SUD treatment records of its own accord, it erred in doing so.

## III.   Mr. Flores's substance use disorder treatment records are subject to the exclusionary rule.

Mr. Flores's SUD treatment records are subject to the exclusionary rule. As a threshold matter, the Government made no argument that the exclusionary rule was inapplicable, under the good-faith doctrine, the independent source doctrine, or otherwise. The burden was on the Government to establish either of these exceptions to the exclusionary rule. *United States v. Morales*, 987 F.3d 966, 974 (11th Cir. 2021) (good faith); *Nix v. Williams*, 467 U.S. 431, 444 & n.5 (1984) (independent source and inevitable discovery). Instead, the magistrate judge made those arguments for the Government, and then the district court denied Mr. Flores's first motion to suppress on grounds raised *sua sponte*. The district court should not have considered the good-faith and independent-source doctrines, because the Government waived any reliance on them by failing to raise them below. *See United States v. Ross*, 963 F.3d 1056,

28

1057 (11th Cir. 2020) (en banc). But even setting aside the waiver issue for the sake of argument, there is no factual basis here that could support application of either exception to the exclusionary rule.

### A. A post-hoc order authorizing disclosure does not provide a basis for application of the good faith exception.

The lower court concluded that "TFO Camp obtained the New Seasons security videos in good-faith reliance upon a court order and an apparently valid statute." Doc. 86 at 17. However, because the searches of the videos were conducted prior to obtaining the § 2.65 order under the statute, TFO Camp could not have relied upon the court order—which did not exist at the time of the search—in good faith.

The good faith exception applies when police act in objectively reasonable reliance on a warrant, or when law enforcement acted "in objectively reasonable reliance on a statute authorizing warrantless . . .searches." *Illinois v. Krull*, 480 U.S. 340, 342 (1987). Here, there was neither a warrant nor a statute authorizing a warrantless search.  Even if DAPTRA authorizes warrantless searches when a § 2.65 order is obtained—and Mr. Flores maintains it does not—law enforcement could not have relied on any belief that such an order was sufficient, because they did not have such an order at the time of the visual examinations of

the written records and videos. Indeed, law enforcement's initial examinations of the substance use disorder treatment records were illegal under DAPTRA, and the clinic's decision to comply with the subpoenas in the absence of a § 2.65 order violated federal law. Thus, law enforcement could not have been reasonably relying on a belief that DAPTRA authorized a warrantless search under the circumstances.

**B. The independent source doctrine is inapplicable where law enforcement conducted multiple searches without ever obtaining a search warrant.**

The independent search doctrine is inapplicable here, where law enforcement conducted multiple searches without ever obtaining a search warrant. Where the police conduct an unlawful search and then rely on what they found to obtain a search warrant, courts ordinarily apply a two-step test to determine if the independent-source doctrine nonetheless permits admission of the evidence. *United States v. Noriega*, 676 F.3d 1252, 1260 (11th Cir. 2012) (citation omitted). Under *Noriega*, first, the court "excise[s] from the search warrant affidavit any information gained during the arguably illegal initial entry and determine[s] whether the remaining information is enough to support a probable cause finding." *Id.* (citation omitted). "If the remaining or

nonexcised information is enough to support a probable cause finding, the second [step] is [to] determine whether the officer's decision to seek the warrant was 'prompted by' what he had seen during the arguably illegal entry." *Id*. (citations omitted). "To determine whether an officer's decision to seek a warrant is prompted by what he saw during the initial entry, courts ask whether the officer would have sought the warrant even if he had not entered." *Id*. at 1260-61 (citation omitted). However, here, the police never obtained a search warrant, so the facts do not fit the *Noriega* test.

Even if the *Noriega* test could be applied to the instant facts, such as if the § 2.65 order could somehow substitute for a search warrant, the Government would fail at both steps. First, if all of the information from the initial records searches were removed from the Government's application for the § 2.65 order, there would not be probable cause to search the SUD treatment records. All that would remain that would touch on New Season would be the application's description of the Michael Field interview, and all that said about New Season was that Mr. Flores visited New Season before Mr. Field dropped him off near the site of the February 25, 2022 robbery. Doc. 51 at 37-38. That is not a

31

sufficient showing that the SUD treatment records from February 25 would provide evidence of the robbery, and it says *absolutely nothing* about whether the videos from February 13 would provide evidence of the robbery on that day. The only information in the application that demonstrated that the videos would provide evidence of a crime was the information that came from the initial unlawful searches.

Second, in any event, the Government never even attempted to show that its § 2.65 application was not prompted by the initial visual examinations of Mr. Flores's SUD treatment records. The evidence in the record shows that the visual examinations of the SUD treatment records were the Government's big break in the investigation, and that they were what motivated the Government to start working so diligently at obtaining physical possession of the SUD treatment records. The independent-source doctrine cannot save the Government's evidence.

## IV. The evidence derived from the searches of Mr. Flores's substance use disorder treatment records is fruit of the poisonous tree.

It is well-settled that evidence directly obtained as the result of an unlawful search must be suppressed and that "the exclusionary rule also

prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint." *Murray v. United States*, 487 U.S. 533, 536-37 (1988) (internal quotation omitted). Here, the initial unlawful search was Officer Burgos's examination of Mr. Flores's written patient records at New Season. It was from searching those written patient records that Officer Burgos determined which videos he wanted to examine, which he also did without a warrant. *See* Doc. 86 at 5. After concluding that the videos showed Mr. Flores wearing clothing that matched the robber, he took a picture of the footage and reported what he had seen. Later, Officer Brown returned to New Season to search the videos on the day of a different robbery, finding Mr. Flores wearing clothes that matched those on the robber shortly before the robbery. With all this knowledge, the government then obtained copies of the videos. TFO Camp then requested the unrelated burglary arrest video, showing Mr. Flores with the red hooded sweatshirt worn by the robber. Next, the Government indicted and arrested Mr. Flores, and interrogated him

33

about the New Season videos, leading to Mr. Flores's admissions. After that, the case agent confronted Mr. Qawi about the videos, leading to Mr. Qawi's identification of Mr. Flores and his use as a witness. *See* Doc. 86 at 9-10. Thus, Officer Burgos's search of the written dosing records was the poisonous tree that led to the government searching and later obtaining the New Season videos,[7] the red hooded sweatshirt video, Mr. Flores's admission, and Mr. Qawi's identification of Mr. Flores. Because law enforcement warrantlessly searched Mr. Flores's SUD treatment records, the evidence derived from that search must be excluded as fruit of the poisonous tree.

## CONCLUSION

For all these reasons, Mr. Flores asks the Court to reverse the lower court's rulings on his motions to suppress.

A. Fitzgerald Hall, Esq.
Federal Defender

*/s/ Melissa Fussell*
Melissa Fussell, Esq.
Assistant Federal Defender
Appellate Division
Florida Bar No. 0125967

---

[7] Additionally, as discussed above, the warrantless search of the videos was itself a poisonous tree.

201 S. Orange Ave., Suite 300
Orlando, Florida 32801
Telephone: (407) 648-6338
Email: Melissa_Fussell@fd.org
Counsel for Appellant

## Certificate of Compliance

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 7,251 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

*/s/ Melissa Fussell*
Melissa Fussell, Esq.
Assistant Federal Defender